## No. 25-1102

In the United States Court of Appeals
for the Sixth Circuit

_____

# United States of America,

Plaintiff-Appellant,

v.

# Jameel Anthony Dion Tanzil,

Defendant-Appellee.

_____

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 23-cr-20654 (Hon. Nancy G. Edmunds)

_____

## Brief for the United States

_____

Jerome F. Gorgon Jr.
United States Attorney

Meghan Sweeney Bean
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-0214
meghan.bean@usdoj.gov

# Table of Contents

Table of Authorities....................................................................... iii

Request for Oral Argument.........................................................vi

Jurisdictional Statement..........................................................1

Introduction................................................................................2

Issues Presented.........................................................................4

Statement of the Case ..............................................................5

A.   A state murder investigation uncovers evidence of Tanzil's illegal gun possession and other suspected crimes. .......................5

B.   An experienced ATF agent prepares an affidavit in support of a federal search warrant for Tanzil's iPhone. .............................5

   i.   Tanzil is a convicted felon.......................................................7

   ii.  Tanzil admits he was at the murder scene but claims that his iPhone will exonerate him. ...............................7

   iii. Tanzil uses Snapchat to share a photo of guns that he tries to illegally buy from a co-worker. ........................................10

   iv.  Tanzil is captured on surveillance video shooting at a man outside a hookah lounge.........................................11

   v.   Police find a gun hidden in Tanzil's bedroom during a probation compliance check. ..................................................13

   vi.  The affiant's significant training and experience investigating firearms offenses............................................14

   vii. Tanzil also commits unemployment insurance fraud. .........16

C.    A federal magistrate judge authorizes the warrant to
      search Tanzil's iPhone, and Tanzil is charged with illegally
      possessing ammunition. ................................................................17

D.    Tanzil moves to suppress evidence found on his iPhone..............19

Summary of the Argument .................................................................25

Argument..............................................................................................27

I.    The federal magistrate judge who authorized the search
      warrant had a substantial basis to find probable cause that
      Tanzil's iPhone contained evidence of the target gun
      offenses. .......................................................................................27

      A.    The affidavit provided more than a substantial basis
            for the federal magistrate judge's probable cause
            determination.........................................................................30

      B.    The district court erred when it reassessed probable
            cause and found it lacking. ...................................................37

II.   An objectively reasonable agent could have relied on the 30-
      page federal search warrant in good faith....................................45

Conclusion ...........................................................................................52

Certificate of Compliance with Rule 32(a)............................................53

Certificate of Service ............................................................................54

Relevant District Court Documents.......................................................55

# Table of Authorities

## Cases

*Carpenter v. United States*, 585 U.S. 296 (2018) ....................................35

*Davis v. United States*, 564 U.S. 229 (2011) .....................................45, 46

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ....................28, 41, 42

*Hudson v. Michigan*, 547 U.S. 586 (2006) .............................................45

*Illinois v. Gates*, 462 U.S. 213 (1983)...................................28, 29, 30, 39

*Riley v. California*, 573 U.S. 373 (2014) ................................................37

*Texas v. Brown*, 460 U.S. 730 (1983) .....................................................28

*United States v. Bass*, 785 F.3d 1043 (6th Cir. 2015)......................31, 35

*United States v. Brooks*, 594 F.3d 488 (6th Cir. 2010) ...........................27

*United States v. Carpenter*, 360 F.3d 591 (6th Cir. 2004) ...............46, 47

*United States v. Christian*, 925 F.3d 305
    (6th Cir. 2019) (en banc) ...................................................... passim

*United States v. Dauphinais*, No. 22-2141, 2024 WL 751653
    (6th Cir. Feb. 23, 2024) ..........................................................48, 51

*United States v. Elmore*, 18 F.4th 193 (6th Cir. 2021) ...........................29

*United States v. Hines*, 885 F.3d 919 (6th Cir. 2018) ......................29, 47

*United States v. Kinison*, 710 F.3d 678 (6th Cir. 2013)...................44, 46

*United States v. Laughton*, 409 F.3d 744 (6th Cir. 2005)......................46

*United States v. Leon*, 468 U.S. 897 (1984) ...........................................46

*United States v. McCoy*, 905 F.3d 409 (6th Cir. 2018) ..............34, 42, 49

*United States v. Merriweather*, 728 F. App'x 498
(6th Cir. 2018) ..................................................................... 31, 50, 51

*United States v. Neal*, 106 F.4th 568 (6th Cir. 2024) ............................ 47

*United States v. Peterson*, No. 23-1413, 2024 WL 4616079
(6th Cir. Oct. 30, 2024).................................................................... 35

*United States v. Pikyavit*, 527 F.3d 1126 (10th Cir. 2008).................... 42

*United States v. Rolling*, No. 23-1045, 2024 WL 4512532
(6th Cir. Oct. 17, 2024)................................................ 31, 49, 50, 51

*United States v. Sanders*, 106 F.4th 455
(6th Cir. 2024) (en banc) ...................................................... passim

*United States v. Sheckles*, 996 F.3d 330 (6th Cir. 2021) ....................... 31

*United States v. Smith*, No. 21-1457, 2022 WL 4115879
(6th Cir. Sept. 9, 2022) .................................................................... 36

*United States v. Tagg*, 886 F.3d 579 (6th Cir. 2018) .................. 29, 40, 41

*United States v. White*, 874 F.3d 490 (6th Cir. 2017) ............................ 49

*United States v. Williams*, 544 F.3d 683 (6th Cir. 2008)........................ 38

## Statutes

18 U.S.C. § 1028A ......................................................................7

18 U.S.C. § 1341 .......................................................................6

18 U.S.C. § 1343 .......................................................................6

18 U.S.C. § 1344 .......................................................................6

18 U.S.C. § 1349 .......................................................................6

18 U.S.C. § 3231 .......................................................................1

18 U.S.C. § 3731 .......................................................................1

18 U.S.C. § 922(g)(1) ............................................................6, 18

18 U.S.C. § 922(j) .....................................................................6

## Rules

Fed. R. App. P. 4(b)(1)(B)(i) .....................................................1

## Request for Oral Argument

The government is appealing the district court's order suppressing evidence obtained from a cellular phone pursuant to a federal search warrant. Although the district court's errors are apparent from the record, oral argument might assist the Court in understanding the legal issues. The government therefore requests oral argument.

# Jurisdictional Statement

The district court had jurisdiction under 18 U.S.C. § 3231 because the case involves an "offense[] against the laws of the United States." This Court has jurisdiction under 18 U.S.C. § 3731 because the government is appealing "a decision or order of a district court suppressing or excluding evidence . . . in a criminal proceeding."

The district court entered the suppression order on January 2, 2025. (R.47: Order, 361–69). The government timely appealed on January 31, 2025, with a certification from the Acting United States Attorney that the appeal "is not taken for purposes of delay and that the evidence is a substantial proof of a fact material in this proceeding." (R.50: Notice of Appeal, 377; R.50-1: Certification, 378); *see* 18 U.S.C. § 3731; Fed. R. App. P. 4(b)(1)(B)(i). The Acting Solicitor General authorized the prosecution of this appeal.

1

## Introduction

Jameel Tanzil is a multi-convicted felon who cannot legally possess or purchase guns. Yet in the three months before police arrested Tanzil and seized his iPhone—and while he was on probation—Tanzil was identified as a shooter in two shootings (one fatal), police recovered two guns used in the murder from a home with Tanzil's child inside, Tanzil admitted that he possessed three other guns belonging to someone else, and police recovered another gun hidden in his bedroom.

How did prohibited Tanzil get so many guns? Investigators uncovered one way. Weeks before the shootings, Tanzil coordinated with his co-worker to illegally buy four guns. When they met, his co-worker saw Tanzil photograph the guns and send a photo of them to someone on Snapchat. The co-worker got cold feet and did not sell Tanzil the guns, but they were stolen from his car the next day. Police suspected Tanzil, who was the only one who knew the guns were there.

Police arrested Tanzil after a witness named him as one shooter in a murder. Tanzil waived his rights and admitted to police that he was at the murder scene that night. But he claimed that evidence in his iPhone—the same phone police seized—would exonerate him.

An experienced ATF agent included these facts, and far more, in a 30-page, 74-paragraph warrant affidavit to search Tanzil's iPhone for evidence of illegal gun possession, possession of stolen guns, and unemployment insurance fraud. A federal magistrate judge authorized the warrant. A resulting search uncovered photos and other information identifying Tanzil as the shooter in a non-fatal shooting outside a hookah lounge and other photos of Tanzil with guns.

After Tanzil was charged with illegally possessing ammunition during the hookah-lounge shooting, the district court suppressed the evidence recovered from his iPhone. Rather than deferring to the magistrate judge, the court improperly weighed probable cause anew and found that the affidavit lacked a nexus between Tanzil's iPhone and evidence of the target offenses. It also declined to apply the good-faith exception.

That suppression decision should be reversed. The case-specific facts in the detailed affidavit provided more than a substantial basis for the federal magistrate judge who signed the warrant to find probable cause, and the district court was wrong to find otherwise. And it erred again when it summarily declined to apply the good-faith exception.

3

# Issues Presented

I.      Did the federal magistrate judge who authorized a warrant to search Tanzil's iPhone have a substantial basis for finding probable cause that evidence of the specified firearms violations would be on his iPhone?

II.      If not, were the allegations in the affidavit sufficient such that an objectively reasonable agent could rely on the federal search warrant in good faith?

# Statement of the Case

## A.    A state murder investigation uncovers evidence of Tanzil's illegal gun possession and other suspected crimes.

On October 28, 2023, a 16-year-old girl was shot and killed in Pontiac, Michigan. (R.47: Order, 361). Jameel Tanzil, a convicted felon on probation, was quickly identified as a suspect in the girl's murder. (*Id.*). Two days later, police arrested Tanzil at a home in Pontiac. (*Id.*). Inside, they found a blue iPhone on the counter, confirmed that it was Tanzil's, and seized it. (*Id.*, 361–62 & n.1). The next day, a state magistrate judge signed a search warrant for Tanzil's iPhone, and police extracted the iPhone's contents onto a flash drive. (*Id.*, 362).

Meanwhile, further investigation linked Tanzil to other suspected crimes—a shooting outside a hookah lounge, illegal possession of guns and ammunition, and unemployment insurance fraud. (*Id.*). ATF began an investigation of its own.

## B.    An experienced ATF agent prepares an affidavit in support of a federal search warrant for Tanzil's iPhone.

As part of his investigation, ATF Special Agent Kenton Weston applied for a federal search warrant of Tanzil's iPhone and the flash

drive containing its extraction.[1] (*Id.*). By design, his affidavit did not contain facts learned from any state searches. (R.40: Gov. Response to Federal SW Motion, 265; R.53: Hrg. Tr., 393–94).

As set forth in the 30-page affidavit, Agent Weston has been an ATF agent since January 2018 and has received extensive training in firearms and other criminal investigations. (R.36-2: Warrant, 218–19, ¶¶ 11–12). He was assigned to the Pontiac Gun Violence Task Force (GVTF), which investigates unlawful gun possession and other violent crimes in Pontiac. (*Id.*, 219, ¶ 12). He has been involved in over one hundred investigations of violent crimes, resulting in the seizure of illegal drugs and hundreds of guns. (*Id.*).

Here, Agent Weston concluded that there was probable cause to believe that Tanzil's iPhone would contain evidence of violations of 18 U.S.C. § 922(g)(1) (possession of a firearm by a convicted felon), 18 U.S.C. § 922(j) (possession of a stolen firearm), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (conspiracy to commit all three frauds), and 18 U.S.C.

---

[1] The flash drive contained the same evidence as the iPhone itself. For the sake of simplicity, this brief will refer to the federal warrant as authorizing a search of Tanzil's iPhone.

6

§ 1028A (aggravated identity theft). (R.36-2: Warrant, 219–20, ¶ 14).

### i.      Tanzil is a convicted felon.

Agent Weston included Tanzil's felony criminal history in the affidavit to show that he was prohibited from possessing guns. Tanzil had previously been convicted of receiving and concealing stolen property (*id.*, 229, ¶35a), carrying a concealed weapon (*id.*, 229–30, ¶ 35b), possessing with intent to deliver a controlled substance (*id.*, 230, ¶ 35c), and delivery and manufacture of narcotics (*id.*, 230–31, ¶ 35d). Tanzil committed his two drug offenses in West Virginia, and he was on probation for them at the time. (*Id.*, 230–31, ¶¶ 35c–d). Tanzil had previously had his probation revoked in another case and failed to have a delayed sentence reduced after he choked someone during a domestic dispute. (*Id.*, 229–30, ¶¶ 35a–b).

### ii.     Tanzil admits he was at the murder scene but claims that his iPhone will exonerate him.

The affidavit laid out the investigation, which began when members of the Oakland County Sheriff's Office (OCSO) responded to a traffic accident and assault involving Tanzil and "unidentified suspect one" at S. Johnson Avenue and Menominee Road in Pontiac on

October 28, 2023. (*Id.*, 221, ¶ 19). Witnesses said that Tanzil was a passenger in a dark-colored SUV, but neither Tanzil nor "unidentified suspect one" were present by the time OSCO arrived on the accident scene. (*Id.*).

An hour later, a 16-year-old girl was shot and killed near the same intersection. (*Id.*, 220–21, ¶¶ 16, 19). OCSO found eight .40 caliber fired cartridge casings in the driveway of 175 S. Johnson Avenue and five 9mm fired cartridge casings on the sidewalk between that residence and the house next door. (*Id.*, 221, ¶ 17). Witnesses saw muzzle flashes coming from that area during the shooting. (*Id.*). One witness saw gunshots and then watched three men run over to check on the victim. (*Id.*, ¶ 18). Two of the men got into a dark-colored SUV that was parked at 175 S. Johnson and left, heading northbound. (*Id.*). The witness said that one suspect, referred to as "unidentified suspect one," frequently drives a black Yukon or Suburban. (*Id.*).

The next day, police searched 175 S. Johnson. Inside, they found three of "unidentified suspect one's" minor children and one of Tanzil's minor children home alone. (*Id.*, 222, ¶ 20). They also found two guns in a backpack hidden under the basement stairs. (*Id.*, ¶ 21). One gun was

a black, loaded Palmetto State Armory PX9 9mm pistol. (*Id.*, ¶ 21a).
There was also a 33-round magazine for that gun, loaded with 13
rounds of ammunition. (*Id.*). The other gun was an empty Taurus G2C
.40 caliber pistol. (*Id.*, ¶ 21b). The magazine was inserted and the slide
was locked to the rear, consistent with the condition of a gun after
someone has fired all the rounds in the magazine. (*Id.*). Both guns were
later test fired, and the test-fire casings matched those recovered from
the murder scene. (*Id.*, 222–23, ¶ 21b). Later, police spoke to another
witness, who saw Tanzil shoot a gun at the murder victim and knew
that his black Palmetto State Armory PX9 9mm pistol had been hidden
inside 175 S. Johnson. (*Id.*, 223, ¶ 22).

Tanzil was arrested for the murder on October 30. (*Id.*, ¶ 23).
Police advised Tanzil of his *Miranda* rights and he agreed to speak with
them. (*Id.*, ¶ 24). Tanzil told officers that:

- "he handled three guns" that belonged "to someone else" a
  few weeks before the murder. (*Id.*, ¶ 24a).

- he was "at 175 S. Johnson Avenue on the night of the
  shooting" but "denied being involved." (*Id.*, ¶ 24b).

- "evidence that he did not commit the homicide would be
  store[d] on" his iPhone. (*Id.*, ¶ 24c).

### iii.    Tanzil uses Snapchat to share a photo of guns that he tries to illegally buy from a co-worker.

Agent Weston's affidavit also explained that while investigating the murder, police learned that Tanzil was suspected of stealing four guns from his co-worker in Auburn Hills, Michigan, in August 2023. (*Id.*, 224, ¶ 26). Police first spoke to the owner of the stolen guns, Tanzil's co-worker, who confirmed that he worked with Tanzil. (*Id.*). According to the gun owner, he brought four of his guns to work and considered selling them to Tanzil. (*Id.*). When he learned that Tanzil was on probation, however, he decided not to complete the sale. (*Id.*). The next day, the victim noticed that the guns had been stolen from his car, but he did not know when they had been stolen. (*Id.*).

Agent Weston and another ATF agent interviewed the gun owner again. (*Id.*, ¶ 27). The owner told the agents that:

- he worked with Tanzil at Edscha in Auburn Hills. (*Id.*, ¶¶ 27a, 27c).

- he went with Tanzil to a Shell gas station during a 30-minute work break at 3:00 a.m. (*Id.*, 225, ¶ 27d).

- he showed Tanzil the four guns after returning to Edscha. (*Id.*).

- he saw Tanzil take "photographs of the firearms" and "sen[d] a photograph to a contact on Snapchat." (*Id.*).

- he considered selling the guns to Tanzil but decided not to, after noticing that Tanzil was wearing a GPS tether and learning that he was on probation. (*Id.*, ¶ 27e).

- Tanzil was approximately ten to fifteen minutes late returning to work. (*Id.*, ¶ 27f).

- he had not talked about the guns in his car (that were later stolen) to anyone but Tanzil. (*Id.*, 224, ¶ 27b).

### iv.    Tanzil is captured on surveillance video shooting at a man outside a hookah lounge.

Agent Weston's affidavit also detailed Tanzil's illegal possession of a gun and ammunition when he shot at a man outside a hookah lounge in Pontiac on September 10, several weeks before the murder. At around 1:47 a.m., OCSO personnel on a separate call heard several shots fired nearby. (*Id.*, 225, ¶ 28). Multiple people called 911 to report a shooting at the Exotic Hookah Lounge. (*Id.*). OCSO responded and spoke to the owner, who said a fight broke out inside the lounge and spilled into the parking lot where the shooting occurred. (*Id.*, 225–26, ¶ 28). Surveillance video captured the fight. (*Id.*, 226, ¶ 28).

The next day, Agent Weston reviewed that surveillance video. (*Id.*, ¶ 29). The fight started between two people inside the lounge and then spilled outside. (*Id.*). Once outside, "individual one," who was wearing a black track suit, struck Tanzil, who was wearing a white long-sleeve

shirt with his hair in a "top bun." (*Id.*). Tanzil then pulled a black pistol from a waist bag that was slung across his chest as he ran northwest through the parking lot and held the gun at his side. (*Id.*). Tanzil walked back toward the sidewalk and momentarily disappeared out of view, but he then returned to the frame and ran south on the Baldwin Avenue sidewalk with a black pistol in his right hand. (*Id.*). Then, "individual one" pulled a gun and fired at Tanzil. (*Id.*). Tanzil ducked and fired three shots at "individual one" before running north and crossing the street. (*Id.*). OSCO later recovered three 9mm Luger Blazer fired cartridge casings from the area where Tanzil fired. (*Id.*).

Agent Weston later confirmed that Tanzil was wearing a court-mandated GPS tether while on probation. (*Id.*, 226–27, ¶ 30). He also verified that Tanzil's tether placed him at the hookah lounge at the time of the shooting. (*Id.*, 227, ¶¶ 30–31). One minute after the shooting, Tanzil's tether showed him traveling north on Baldwin Avenue and east on E. Montcalm Street, which was consistent with the shooter's route captured on video. (*Id.*, 227, ¶ 32).

### v.    Police find a gun hidden in Tanzil's bedroom during a probation compliance check.

As a condition of his probation, Tanzil was required to submit to a warrantless search of his home if his probation officer had reasonable cause to believe that he had items that violate his probation terms or had safety concerns. (*Id.*, 227, ¶ 33). Three days after the murder, police accompanied Tanzil's probation officer on a compliance check of his probation address in Pontiac. (*Id.*, 227–28, ¶ 34). Inside a cabinet in Tanzil's bedroom, police found a loaded black American Tactical .22 caliber rifle with an extended magazine. (*Id.*, 228, ¶ 34). Tanzil's mother, who lived in the home with Tanzil and her eight-year-old son, "appeared shocked" at the discovery. (*Id.*). The affidavit included a photo of the rifle and drum magazine, as police found it:



### vi.     The affiant's significant training and experience investigating firearms offenses.

Agent Weston also provided significant information about his training and experience with people who are prohibited from possessing guns. As he explained, prohibited persons like Tanzil often have evidence of their gun offenses on their phones. In his experience, individuals who are prohibited from possessing guns or ammunition will "communicate and coordinate with others to acquire firearms or discuss their illicit actions." (*Id.*, 239, ¶ 57). Often, they will communicate through social media applications that are accessed by a cell phone, and the data from that application is likewise stored on the phone. (*Id.*, 239, ¶ 56). People who possess guns often take pictures and videos with them on cell phones and post the photos to social media. (*Id.*, 241, ¶ 61). This experience proved accurate in Tanzil's case, where his co-worker saw "Tanzil capturing images of firearms and sending them to other[s] via the Snapchat app." (*Id.*, 239, ¶ 57).

Agent Weston also explained that he has reviewed dozens of cell phones and social media returns for individuals who illegally possess guns. In doing so, he has repeatedly seen communications on cell phones and social media "regarding the acquisition and disposition of

14

firearms, ammunition, and trafficking of controlled substances." (*Id.*, 240, ¶ 58). Agent Weston made clear that "any communications related to Tanzil's acquisition or use of . . . firearms and or ammunition" would be "evidence related to ATF's investigation" into Tanzil's "illegal possession of firearm(s)." (*Id.*). Again, he emphasized that his training and experience were borne out in the facts of Tanzil's case, where a witness saw Tanzil photograph guns he was trying to illegally purchase (and that later were stolen), and Tanzil admitted that there was evidence on his phone related to the murder, even if he claimed that it would exculpate him. (*Id.*, 239, 242, ¶¶ 57, 63).

Finally, the affidavit explained that people usually "keep their cellular phones with or near their person at all times," and cell phones leave a "GPS footprint" that shows the location of the device. (*Id.*, 240, ¶¶ 59–60). This location information is helpful to law enforcement "in establishing a timeline, [to] pinpoint the individual's location during criminal acts, and [to] identify additional suspects." (*Id.*, 240–41, ¶ 60).

15

### vii.    Tanzil also commits unemployment insurance fraud.

Agent Weston was also investigating Tanzil's suspected mail, bank, and wire fraud (and conspiracy to commit all three), and aggravated identity theft committed between April 2020 and July 2021.

A query by the U.S. Department of Labor, Office of Inspector General, revealed that unemployment insurance (UI) applications were filed using Tanzil's name, social security number, and date of birth in Michigan, Pennsylvania, Arizona, Kansas, Hawaii, West Virginia, and Georgia. (*Id.*, 235–36, ¶¶ 44–50). The email address listed on four of those claims was "mylesdeshon@gmail.com," and the phone number listed on four claims had a "248" area code, which covers Pontiac and other areas in metro-Detroit. (*Id.*). Two of those claims were associated with a specific IP address ending in .44 (IP 44) that investigators learned was a residence in the Detroit area. (*Id.*, 235–37, ¶¶ 48–49, 52). In total, 31 UI claims were filed from IP 44. (*Id.*, 237, ¶ 52). One of those claims filed from IP 44 was filed in Colorado using the name of a real person, Z.M., but the email address listed was the same: "mylesdeshon@gmail.com." (*Id.*, 236–37, ¶ 52).

16

Agent Weston also had training and experience related to UI fraud. (*Id.*, 232–34, 237–38, ¶¶ 38–43, 53–55). Agent Weston's career experience before becoming an ATF agent included auditing and conducting financial investigations for companies. (*Id.*, 237, ¶ 54). As an ATF agent, he has worked on several UI fraud cases and is familiar with the markers of UI fraud. These markers include multiple UI claims filed using the same personally identifiable information (PII), specific types of banking activity, and the frequent use of electronic devices like cell phones to commit UI fraud and to store and trade PII. (*Id.*, 238–39, ¶¶ 54–55). He also knows that when individuals switch devices, they can transfer information to a new device. (*Id.*, 239, 242, ¶¶ 55, 64). Often, people who commit UI fraud maintain stolen PII "for months or even years" on "multiple devices," because of the fraud schemes that can be perpetrated using stolen PII. (*Id.*, 238–39, ¶ 55).

## C.   A federal magistrate judge authorizes the warrant to search Tanzil's iPhone, and Tanzil is charged with illegally possessing ammunition.

After reviewing Agent Weston's 30-page, 74-paragraph affidavit, a federal magistrate judge signed the warrant authorizing the search of Tanzil's iPhone for specific evidence of illegal possession of guns,

possession of stolen guns, bank fraud, mail fraud, wire fraud (and conspiracy to commit all three frauds), and aggravated identity theft. (R.36-2: Warrant, 215–46; R.40-1: Warrant Attachments, 286–89).

As relevant to this appeal, agents searched Tanzil's iPhone and found evidence of his illegal possession of guns and ammunition. Among other relevant evidence, they found a photo dated the same day as the hookah lounge shooting showing Tanzil wearing the same distinctive red and white designer shirt, black pants, and red and white Nike Air Jordan shoes as the shooter captured on surveillance video, and with the shooter's same hairstyle. They also found a photo taken about two weeks earlier of Tanzil in the driver's seat of a car with a gun at his feet and his GPS tether visible. An activity sensor application on the phone also shows that Tanzil was running at the same time as the shooter captured on video was fleeing the hookah-lounge scene on foot. Moreover, about an hour after the 16-year-old girl's murder, Tanzil texted someone that he was "on the RUN" because "police was there."

Tanzil was charged with possessing ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), based on the casings he left behind during the hookah-lounge shooting. (R.14: Indictment, 42).

18

**D.    Tanzil moves to suppress evidence found on his iPhone.**

Tanzil first challenged the initial seizure of his iPhone during his arrest and the brief "search" when agents powered it on to confirm it belonged to him. (R.22: Motion, 61–71). While the parties litigated that motion, the district court learned that historical GPS ping data for Tanzil's iPhone placed him in the area of the 16-year-old girl's murder in Pontiac at the time of the shooting. (R.28: Gov. Response, 164; R.34: Order, 201). It also showed Tanzil leaving Pontiac for Detroit directly after the shooting with another suspect. (*Id.*). And although Tanzil largely left his phone powered off after the murder, limited ping data for Tanzil's iPhone also allowed police to locate and arrest him in Pontiac two days later. (*Id.*, 201–02). The district court denied the motion to suppress the seizure and limited "search" of Tanzil's cell phone. (*Id.*, 202–04).

Later, Tanzil moved to suppress evidence recovered from his iPhone pursuant to both the state and federal search warrants. (R.23: State Warrant Motion, 72–90; R.36: Federal Warrant Motion, 207–12; R.45: Combined Reply, 349–54). With respect to the federal warrant, Tanzil admitted that the "affidavit provides sufficient information to

establish [his] connection to firearms." (R.36: Federal Warrant Motion, 211). But Tanzil claimed, merely by incorporating his challenge to the less detailed state warrant, that the federal warrant failed to establish a nexus between his iPhone and evidence of alleged criminal activity, as necessary for probable cause. (*Id.* at 212 (incorporating by reference R.23: State Warrant Motion, 77–89)). He also claimed, again based on his challenge to the state warrant, that the federal warrant was overbroad. (*Id.*).

The government opposed both motions. (R.41: Gov. Response to State SW Motion, 290–309; R.40: Gov. Response to Federal SW Motion, 264–85). With respect to the federal warrant, it argued that there was "both direct and circumstantial evidence" that Tanzil's iPhone would contain evidence of the target offenses. (*Id.*, 275). For example, Tanzil's statement to police that he was at the scene of the murder but his iPhone would clear him of the crime provided reason to believe that the iPhone contained evidence related to illegal gun possession, even if by someone else. (*Id.*). That belief was further supported by evidence that Tanzil took photos of his co-worker's guns that he was trying to illegally purchase (and was suspected of later stealing) and sent one to a

20

Snapchat contact, especially when considered in light of the agent's training and experience. (*Id.*, 276). Furthermore, the evidence that Tanzil committed UI fraud, together with the agent's training and experience about the use of cell phones when committing fraud, supported probable cause. (*Id.*). The government also argued that the warrant was not overbroad, but even if it were, the proper remedy was to sever the portion that was. (*Id.*, 276–80). In any event, it argued that the good-faith exception to the exclusionary rule should apply because the affidavit was "far from . . . bare bones." (*Id.*, 280–84).

At the motion hearing, Tanzil "primarily address[ed] the federal warrant," admitting that it was the "stronger of the two." (R.53: Hrg. Tr., 385). He conceded that the affidavit did "an excellent job in laying out why . . . there was probable cause to believe that [Tanzil] committed crimes." (*Id.*, 388–39). He admitted that the affidavit alleged that "Tanzil was communicating with an individual at work trying to buy [guns]" and "took a picture of the firearms using a cellphone." (*Id.*, 385–86). He also admitted that the affidavit included Tanzil's statement to officers that if they "look[ed] through [his] phone" there would be evidence that he was not involved in the murder. (*Id.*, 386). But Tanzil

nonetheless claimed that the affidavit did not establish a nexus between the evidence sought and his iPhone. (*Id.*, 389).

The government disagreed, highlighting Tanzil's statement that he was at the scene of a fatal shooting but that evidence on his iPhone would exculpate him. (*Id.*, 390). The government also emphasized that Tanzil's co-worker arranged to sell Tanzil guns, met him in a parking lot, and saw Tanzil photograph those guns and send them via social media—and the guns were stolen the following day. (*Id.*, 391–92). This was consistent with the agent's training and experience that prohibited persons often use cell phones and social media to acquire and dispose of guns. (*Id.*). Lastly, the government argued that the good-faith exception should apply, in any event. (*Id.*, 392).

In a nine-page order, the district court suppressed the evidence recovered from Tanzil's iPhone pursuant to both the state and federal warrants. (R.47: Order, 361–69). It largely lumped together its analysis of the two distinct affidavits. (*Id.*).

To start, the court claimed that the affidavits "did not contain any allegations stating the phone was used during the alleged offenses or that it was used to store evidence of the offenses." (*Id.*, 367). It

22

discounted in a footnote the federal affidavit's allegation that a coworker saw Tanzil "t[ake] a photograph of guns that may have been available for purchase" and "sen[d] the photo to a contact on Snapchat," because the affidavit did not specify "what type of device" Tanzil used to take the photo. (*Id.* at n.3). It found that Tanzil's claim that evidence in his iPhone would exonerate him of the murder was insufficient to establish that the phone would contain "contraband or evidence of a crime." (*Id.*, 368).

The district court also complained that the affidavits omitted GPS ping information "showing that the phone was in the area" of the murder and showing Tanzil's whereabouts prior to his arrest— information the court only knew about from the prior, unrelated motion about the iPhone's initial seizure. (*Id.*, 367). The court acknowledged that an affiant's training and experience could be considered in establishing probable cause but found that it was "insufficient on its own" in this case. (*Id.*). The court did not directly address any of the affidavit's facts regarding Tanzil's UI fraud. (*Id.*). It concluded that the state and federal affidavits did not establish a nexus "between the

evidence sought and the place to be searched" and thus did not establish probable cause to search Tanzil's iPhone. (*Id.*, 368).

The district court also refused to apply the good-faith exception to the exclusionary rule. (*Id.*). It found that both affidavits—including the 30-page, 74-paragraph federal affidavit—lacked a "minimally sufficient nexus" between Tanzil's crimes and his iPhone and reasoned that an "objectively reasonable law enforcement officer would have recognized this deficiency." (*Id.*, 368–69). Thus, it suppressed the evidence recovered from Tanzil's iPhone and found it unnecessary to address whether the warrant was overbroad. (*Id.*).

The United States timely appealed. (R.50: Notice of Appeal, 377). The United States challenges the suppression order only as it relates to the federal search warrant—the more detailed of the two warrants.

## Summary of the Argument

A reviewing court is supposed to review a search warrant affidavit to decide whether it provided a "substantial basis" for the magistrate judge's probable cause determination. The district court here quoted that standard but then reweighed probable cause as if deciding the issue in the first instance.

And under any standard, the federal affidavit provided more than enough for the magistrate judge to find probable cause to search Tanzil's iPhone. The affidavit included that Tanzil was a multi-convicted felon who had recently attempted to illegally purchase four guns from his co-worker; he photographed and shared a picture of those guns on social media; he was a suspect in two recent shootings; he traveled to and from the scene of the murder with someone else; he claimed that his iPhone would exonerate him of a murder despite his admitted presence at the scene; and a gun was recovered from his bedroom. Further, the affiant's training and experience led him to conclude that prohibited people in like circumstances often use phones to photograph guns and communicate about illegal activities like acquiring guns. These were just some of the facts that provided a

25

substantial basis for probable cause to search Tanzil's iPhone for evidence of the target firearms violations. The district court erred in concluding otherwise.

The district court also erred when it refused to apply the good-faith exception to the exclusionary rule. Special Agent Weston's 30-page, 74-paragraph affidavit detailed the extensive investigation by police and ATF into Tanzil's suspected crimes. This included a post-*Miranda* interview of Tanzil, multiple residence searches, witness interviews, review of surveillance video and GPS tether location information, and documentary and online investigation, all of which provided probable cause that Tanzil committed several crimes within days or months of when his iPhone was seized along with specific facts showing that it would likely contain evidence of those crimes. Far from "bare bones," the affidavit made clear why the facts supported the issuance of the search warrant, and a reasonably well-trained agent should have been able to rely on it in good faith. Particularly given this Court's recent precedent, including *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (en banc), the district court's decision should be reversed.

# Argument

## I. The federal magistrate judge who authorized the search warrant had a substantial basis to find probable cause that Tanzil's iPhone contained evidence of the target gun offenses.

Because Tanzil is not charged with fraud or identity theft, the district court did not address the allegations related to those target offenses and instead focused on the target firearm offenses. This appeal is likewise limited to whether the affidavit provided a substantial basis for the federal magistrate judge to find probable cause that Tanzil's iPhone would contain evidence of illegal possession of guns and possession of stolen guns. *See, e.g.*, *United States v. Brooks*, 594 F.3d 488, 493 n.4 (6th Cir. 2010) ("Because we find that the information in . . . paragraph 9 was sufficiently strong and reliable on its own to establish probable cause to search the residence, we need not determine whether the information in paragraphs 2 through 8 was relevant for establishing probable cause.").

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause is not a

high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018). It requires the judicial officer "simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Id.* at 232. Proof positive is not required; instead, the "quanta of proof" necessary to establish probable cause is "only the probability, and not a prima facie showing," of criminal activity and likelihood of finding evidence thereof. *Id.* at 235. "[P]robable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983), that considers the totality of the circumstances, *Gates*, 462 U.S. at 232–33, and permits law enforcement to draw "common-sense conclusions about human behavior," *Wesby*, 583 U.S. at 58.

When reviewing a decision to suppress evidence, the Court reviews the district court's factual findings for clear error and its legal determinations—including whether probable cause existed—de novo.

*United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018). But where, as here, the district court reviewed a magistrate judge's probable cause determination for a search warrant, the Court pays the district court "no particular deference" and instead "pays great deference to a magistrate's findings, which should not be set aside unless arbitrarily exercised." *Id.*; *Gates*, 462 U.S. at 236. That is because magistrate judges are tasked with making "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018).

Magistrate judges may draw reasonable inferences from information supplied by search warrant applicants. *Gates*, 462 U.S. at 240. So reviewing courts (including district judges) should not apply de novo review, but rather are required to ask only whether the magistrate had a substantial basis for concluding that probable cause existed. *Id.* at 238–39; *see also United States v. Elmore*, 18 F.4th 193, 202–03 (6th Cir. 2021); *United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019) (en banc). When reviewing a "magistrate's decisions," it is inappropriate

for the district court to conduct "line-by-line scrutiny" of the warrant affidavit. *Gates*, 462 U.S. at 245 n.14. Although the district court here cited the correct standard of review, it incorrectly applied it. (R.47: Order, 366).

### A. The affidavit provided more than a substantial basis for the federal magistrate judge's probable cause determination.

There was more than a substantial basis for the federal magistrate judge to conclude that the warrant affidavit established a sufficient nexus between Tanzil's iPhone and evidence of illegal possession of firearms and stolen firearms.

As a threshold matter, Tanzil conceded below that the federal "search warrant lays out . . . a blueprint for probable cause" that "Tanzil committed a crime," including that Tanzil was "connect[ed] to" illegal gun possession. (R.53: Hrg. Tr., 385; R.36: Federal Warrant Motion, 211). So there was no dispute that the warrant set out probable cause that a crime was committed, and the district court did not need to reach that issue.

The district court's error came at the next step, when it incorrectly found that the warrant affidavit failed to set forth a nexus between

Tanzil's iPhone and evidence of illegal possession of guns and stolen guns. In doing so, it applied the wrong legal standard and improperly discounted case-specific facts and Agent Weston's experience-based knowledge supporting probable cause.

The exact probable cause nexus standard for cell phone searches remains an open question. *See United States v. Rolling*, No. 23-1045, 2024 WL 4512532, at *3 (6th Cir. Oct. 17, 2024) (noting open question, without deciding it). This Court has not decided whether the requisite standard is "a fair probability" that "the phone's data 'will aid in a particular' investigation and disclose evidence of criminal activity" or if, instead, the affidavit must include factual allegations that "the phone itself is being used 'in connection with criminal activity.'" *Id.* (quoting *United States v. Sheckles*, 996 F.3d 330, 338 (6th Cir. 2021)); *see also United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (sufficient nexus when affidavit stated that suspect used cell phones to communicate with co-conspirators and was using the particular phone when arrested); *United States v. Merriweather*, 728 F. App'x 498, 505 (6th Cir. 2018) (declining to decide correctness of underlying probable

31

cause determination and finding good faith, where cell phone had been found in car along with drugs at time of arrest).

The Court need not decide this question here, however, because the magistrate judge had more than a substantial basis for concluding that Agent Weston's affidavit satisfies either test given its case-specific facts tying Tanzil's iPhone to his suspected gun crimes. To start, the affidavit recounted that two-and-a-half months before Tanzil's phone was seized, he and his co-worker arranged for Tanzil to illegally purchase four guns that his co-worker brought to work. (R.36-2: Warrant, 224–25, ¶¶ 26–27f). The men first met in a gas station parking lot on a break in the middle of the night. (*Id.*, 225, ¶ 27d). Later, at work, the co-worker showed Tanzil four guns, watched Tanzil photograph them, and saw Tanzil send a photo of the guns to a contact via the application Snapchat. (*Id.*). The co-worker decided not to sell Tanzil the guns when he noticed Tanzil was wearing a GPS tether and learned he was on probation. (*Id.*, ¶ 27e). But the next day, the four guns were stolen from the co-worker's car and Tanzil was the only person who knew they were there. (*Id.*, 224, ¶¶ 26, 27b). Later, and despite his prohibited status, Tanzil admitted to possessing guns owned

by someone else, he was a key suspect in two shootings, and police found a gun in his bedroom. (*Id.*, 223, 226, 228, ¶¶ 22, 24a, 29, 34).

These case-specific facts—that Tanzil photographed guns at work, used social media to send a picture of them, and coordinated with other people about illegally acquiring guns—were bolstered by Agent Weston's training and experience. He explained that people "who are prohibited from possessing firearms and or ammunition will use various means and modes of communication" like "social media messaging applications" to communicate with others "to acquire firearms." (R.36-2: Warrant, 239, ¶ 57). And Agent Weston has personally reviewed dozens of cell phone and social media warrant returns that support his claim that prohibited persons like Tanzil discuss "the acquisition and disposition of firearms [and] ammunition" on their cell phones and through social media. (*Id.*, 240, ¶ 58). These case-specific facts, and the agent's relevant training and experience, established probable cause for the search warrant here.

But the attempted gun purchase and suspected gun theft were not the only facts that established a nexus between Tanzil's iPhone and evidence of illegal gun possession. Over a period of less than three

33

months, Tanzil was seen firing two different guns at people (*id.*, 223,
226, ¶¶ 22, 29); police recovered two guns from one home associated
with Tanzil, where his small child was left alone with other children
(*id.*, 222, ¶¶ 20–21); Tanzil admitted to recently possessing three more
guns (*id.*, 223, ¶ 24a); and police found another gun with an extended
drum magazine hidden in his bedroom (*id.*, 227–28, ¶ 34). Since Tanzil
was a multi-convicted felon on probation who could not legally purchase
guns or ammunition at a store, common sense dictates that he
coordinated with others, likely by phone, to illegally acquire them
elsewhere. *See United States v. McCoy*, 905 F.3d 409, 416 (6th Cir.
2018) (affidavits should be read "holistically" with a "healthy dose of
common sense"). And Agent Weston's significant training and
experience supported that conclusion. (R.36-2: Warrant, 239–40, ¶¶ 57–
58). Tanzil's attempt to illegally purchase guns from his co-worker was
one example corroborating this.

   In addition, the affidavit established that Tanzil's phone would
likely contain evidence that he and others illegally possessed guns
during the two shootings in September and October 2023. Tanzil was
captured on video firing his gun outside the hookah lounge in

34

September, and tether location data confirmed that he was there. (*Id.*, 225–27, ¶¶ 28–32). Tanzil also admitted that he was at the scene of the October homicide (only two days before his phone was recovered), and a witness identified Tanzil as one of the shooters. (*Id.*, 220–21, ¶¶ 16–19). Because individuals usually carry their phones with them (*id.*, 240, ¶ 59), the magistrate judge could reasonably conclude that Tanzil's phone would contain evidence of his whereabouts during those shootings. *See Carpenter v. United States*, 585 U.S. 296, 311 (2018).

There was also substantial information in the affidavit showing that Tanzil coordinated with others about or during his crimes, such that evidence of illegal (and stolen) gun possession would be on his cell phone. *Bass*, 785 F.3d at 1048–49 (finding sufficient nexus between cellphone and fraud scheme because co-conspirators "frequently used cell phones to communicate"); *see also United States v. Peterson*, No. 23-1413, 2024 WL 4616079, at *5 (6th Cir. Oct. 30, 2024) (resolving appeal on good faith, but noting inference that evidence would be on cell phone because the affidavit described "the coordination of multiple people and vehicles during and after the shooting"). First, the affidavit established that Tanzil coordinated with his co-worker to illegally purchase guns

and sent a photo of those guns through social media. (R.36-2: Warrant, 224–25, ¶¶ 26–27f; R.53: Hrg. Tr., 385 (admitting that the affidavit established that "Tanzil was communicating with an individual at work trying to "buy [guns]" and "took a picture of the [guns]")). Likewise, for the murder, one witness identified Tanzil as a shooter, and another witness saw multiple men shoot at the victim and saw two of them leave the scene together in a dark SUV. (R.36-2: Warrant, 221, 223 ¶¶ 18, 22); *United States v. Smith*, No. 21-1457, 2022 WL 4115879, at *8 (6th Cir. Sept. 9, 2022) (resolving appeal on good faith, but noting, "[g]iven that Smith and Walker 'both fired guns at the deceased,' it seems a judge could reasonably infer that there is a fair probability that Smith and Walker used their cell phones to communicate . . . because that is how people in our modern society generally communicate"). And one hour before the murder, near the scene, police responded to a car accident and assault involving Tanzil and another suspect, but they fled in a dark SUV before police arrived. (R.36-2: Warrant, 221, ¶ 19). Their young children were later found alone together in a house with two guns that matched those fired during the murder. (*Id.*, 222, ¶¶ 20–21). All of this suggests that Tanzil coordinated with others, which Agent

36

Weston's training and experience (*id.*, 239–43, ¶¶ 57–58, 60–61) and common sense dictate would have happened by phone. *See Riley v. California*, 573 U.S. 373, 401 (2014).

Finally, Tanzil himself established a direct nexus between his iPhone and evidence of illegal gun possession. He admitted to police that he was at the murder scene but claimed that his iPhone contained "evidence that he did not commit the homicide." (R.36-2: Warrant, 223, ¶ 24c). This suggested that he carried his iPhone that night, discussed the murder with others, or identified the shooters on the iPhone. And following the murder, a witness identified Tanzil as a shooter, and other witnesses said multiple shooters fled in a dark SUV together. (*Id.*, ¶¶ 22, 24b). Even taken alone, Tanzil's own statements provided the magistrate judge with a substantial basis to find a nexus between his iPhone and evidence of the target gun offenses.

## B. The district court erred when it reassessed probable cause and found it lacking.

The district court's contrary conclusion resulted from its multiple legal and analytical errors. To start, it was wrong to reweigh probable cause instead of asking whether the district court had a "substantial basis" for finding it. *Christian*, 925 F.3d at 310.

37

Moreover, the court misstated what is necessary to establish probable cause. It criticized the affidavit because it "did not contain any allegations stating that the phone was used during the alleged offenses or that it was used to store evidence of the offenses." (R.47: Order, 367). But that was not required. Instead, the affidavit only needed to establish a "fair probability" that evidence would be on the phone, "given the totality of the circumstances." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). Indeed, "a warrant's validity should not turn on whether it is supported by an 'actual showing' of criminal activity at the targeted location." *Sanders*, 106 F.4th at 462 (quoting *Christian*, 925 F.3d at 311). Instead, the correct inquiry is whether the affidavit supports "more than mere suspicion that contraband will be found at the location in question," which is not a "high bar." *Id.* (internal quotations omitted). Based on the affidavit's allegations tying Tanzil's iPhone to evidence of illegal gun possession, it more than cleared that low hurdle.

For its next error, the court improperly "scrutinize[ed]" the affidavit in the same "'hypertechnical' or 'line-by-line' manner" that the Supreme Court has deemed improper. *Id.* (quoting *Christian*, 925 F.3d

at 311); *Gates*, 462 U.S. at 245 n.14 (calling "line-by-line scrutiny" of affidavit "inappropriate in reviewing magistrate's decisions"). One by one, the court discounted each allegation that established a nexus between Tanzil's iPhone and evidence of illegal gun possession. *Christian*, 925 F.3d at 312 (a reviewing court must "look holistically" at the affidavit and not point out the "flaws of each individual component of the affidavit").

For example, in a footnote, the court minimized the significance of Tanzil taking photos of his co-worker's guns that he tried to illegally purchase (and was later suspected of stealing) and sending them to a contact on Snapchat. It found that "there is no indication as to what type of device [Tanzil] used to take the photo." (R.47: Order, 367 n.3). But when assessing probable cause, the magistrate judge's task "is simply to make a practical, common-sense decision" considering the totality of the circumstances. *Gates*, 462 U.S. at 236, 238. And Agent Weston's experience (R.36-2: Warrant, 239, ¶ 57) and common sense dictate that, because Tanzil and his co-worker arranged the gun sale in a gas station parking lot and while at work, they coordinated by phone and Tanzil photographed the guns and sent a photo via Snapchat using

his phone. *See Tagg*, 886 F.3d at 585 (magistrates may rely on "common-sense conclusions about human behavior"); *Christian*, 925 F.3d at 310 ("While this is not a direct statement that Thomas was seen entering or leaving 618 Grandville, the law does not require such a direct statement. Indeed, our precedents require us to eschew such a formal requirement. Affidavits are not required to use magic words." (cleaned up)). Indeed, it strains credulity that Tanzil brought a digital camera to snap photos, then transferred those photos to a computer to send them via Snapchat—all while in a parking lot or at work in the middle of the night. And because this attempted gun purchase happened just over two months before Tanzil's iPhone was seized, he likely took and sent the photos on that same phone. But even if not, Agent Weston explained that "when individuals switch devices, they can transfer information stored on one device to another device." (R.36-2: Warrant, 239, ¶ 55). This information provided a substantial basis for the magistrate judge to find a probable-cause nexus between Tanzil's iPhone and evidence of the target firearms offenses. The district court was wrong to discount it.

40

Continuing in its "divide-and-conquer" dissection of the affidavit, the district court then downplayed Tanzil's own statement tying his iPhone to evidence of illegal gun possession. *Wesby*, 583 U.S. at 62 (holding that reviewing court took an "improper" "divide-and-conquer" approach, when it identified "innocent explanations" for most of the individual circumstances that supported probable cause). He told police that he was at the scene of a murder (where a witness identified him as a shooter) but maintained that his iPhone would contain evidence that he did not kill the girl. Without legal citation, the court concluded that probable cause was lacking because Tanzil pointed police to "exonerating evidence" on his phone, which was not the same as "contraband or evidence of a crime." (R.47: Order, 368). But the court was wrong for several reasons.

To start, neither police nor the magistrate judge were required to take Tanzil at his word that his iPhone would exonerate him. *See Tagg*, 886 F.3d at 589 ("[T]he ultimate plausibility of an innocent explanation cannot be used to snuff out the objectively suspicious inference that can be drawn from the facts presented to a magistrate."). Indeed, "probable cause does not require officers to rule out a suspect's innocent

explanation for suspicious facts." *Wesby*, 583 U.S. at 61. Like in *Wesby*, police here had "plenty of reasons"—including a witness stating that Tanzil was a shooter and investigation that tied several guns to Tanzil—"to doubt [Tanzil's] protestations of innocence." *Id.* at 62. Thus, the district court was wrong to credit Tanzil's self-serving statement, in isolation, and then find that it did not support probable cause to search his phone. *See McCoy*, 905 F.3d at 416 (affidavits should be read "holistically").

And it would set a troubling precedent, indeed, if a suspect's claim that a phone (or a home, or a car) contains exculpatory evidence could automatically shield it from a search, when other facts establish probable cause that the target location contains evidence of a crime. Moreover, adopting this rule would hamstring law enforcement, who have a duty to investigate and disclose exculpatory evidence. *See generally United States v. Pikyavit*, 527 F.3d 1126, 1135 (10th Cir. 2008) (holding police did not exceed scope of consent search where defendant told officers that they would find exculpatory evidence inside home because doing "less would have subjected [the government] to a claim of failure to thoroughly look for exculpatory evidence").

But even if the magistrate judge were required to believe Tanzil that his iPhone would exonerate him of the murder, the district court was still wrong to conclude that the iPhone necessarily would not contain evidence of illegal gun possession. Indeed, the federal warrant sought evidence that Tanzil or others illegally possessed guns or stolen guns—not that Tanzil himself committed the murder. (R.40-1: Federal Warrant Att. B, 287). Tanzil admitted that he was at the murder scene the night of the murder. (R.36-2: Warrant, 223, ¶ 24b). And one witness said that Tanzil was a shooter and possessed a specific gun, and the specific gun (and another gun) were recovered two days later from inside 175 S. Johnson while Tanzil's and another suspect's children were inside. (*Id.*, 221–223, ¶¶ 17–23). Still another witness said that multiple men fired shots and left the scene together in the same car. (*Id.*, 221, ¶ 18). Thus, there was a substantial basis for the magistrate judge to conclude that evidence on Tanzil's iPhone, such as its location information or messages and calls from the night of the murder, could be used to corroborate other evidence that he—or someone else— illegally possessed a gun at the scene, even if Tanzil did not fire the fatal shot(s).

The district court's final error was to criticize the affidavit for "what it lack[ed]" or what it believed "should have been added," instead of focusing on the ample facts that the affidavit did contain. *United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013). Both during the motion hearing and in its suppression order, the district court critiqued the affidavit for omitting GPS ping data for Tanzil's iPhone. (R.47: Order, 362 n.1, 367 ("The affidavit[] did not even contain information regarding the GPS ping data showing that the phone was in the area of the shooting for which [Tanzil] was being investigated at the time and in [Tanzil]'s possession during the days between the shooting and his arrest."); R.53: Hrg. Tr., 396 ("[I]f they had this . . . tracking information, if it coordinated with another defendant they knew was involved in the homicide, it would certainly be something connecting it. But it's not there.")). But the court only knew that law enforcement had GPS ping data for Tanzil's iPhone from briefing and arguments for an earlier suppression motion, and it was wrong to hold Agent Weston's decision not to include that information against the affidavit. *Sanders*, 106 F.4th at 463 ("[W]e value the affidavit as we might those around us. We ask what good qualities it contains, not 'what it lacks.'"). The

affidavit provided more than a substantial basis for the magistrate judge's probable cause finding. It did not need the ping data to clear that low bar.

Thus, the district court's analysis was materially flawed. Read as a whole, Agent Weston's affidavit provided more than a substantial basis for the magistrate judge to conclude that there was probable cause to search Tanzil's iPhone for evidence of the listed firearms violations.

## II. An objectively reasonable agent could have relied on the 30-page federal search warrant in good faith.

Even if there was not a substantial basis for the magistrate judge to find probable cause, the district court should have applied the good-faith exception to the exclusionary rule. Its decision should be reversed on that ground, as well.

The Supreme Court has emphasized that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). Suppressing evidence is a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Suppression is only called for when the police exhibit "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," and not when they "act with an objectively

reasonable good faith belief that their conduct is lawful." *Davis*, 564 U.S. at 238 (cleaned up). The classic example of good faith is when police act "in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). When officers have "no reason to suspect the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" the good-faith exception applies. *Kinison,* 710 F.3d at 685.

The "so lacking in indicia" test for the good-faith exception is less demanding than the "substantial basis" test for a sufficient affidavit. *Christian*, 925 F.3d at 313 (quoting *United States v. Carpenter*, 360 F.3d 591, 595–96 (6th Cir. 2004) (en banc)). The question is whether the officers "'reasonably believed that the warrant was properly issued, *not* whether probable cause existed in fact.'" *Kinison*, 710 F.3d at 685 (quoting *United States v. Laughton*, 409 F.3d 744, 752 (6th Cir. 2005)). Accordingly, the good-faith inquiry is confined to "whether a reasonably trained officer would have known the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23.

This Court has generally equated an affidavit "so lacking in indicia of probable cause" with a "bare bones" affidavit, which merely states suspicions or conclusions without providing the underlying factual circumstances supporting probable cause. *See Sanders*, 106 F.4th at 468–69; *Hines*, 885 F.3d at 927 (bare-bones affidavits either provide "nothing more than a mere guess that contraband or evidence of a crime would be found" or are "completely devoid of facts to support the affiant's judgment that probable cause exists, or so vague as to be conclusory or meaningless"). The good-faith exception thus applies when the factual allegations of an affidavit "establish a minimally sufficient nexus between the illegal activity and the place to be searched." *Carpenter*, 360 F.3d at 595. This Court has recently (and repeatedly) stressed that showing a "minimally sufficient nexus" is "a lower standard than the 'fair probability' needed to demonstrate nexus for purposes of probable cause," which itself requires "only a modest climb." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024); *Sanders*, 106 F.4th at 468–69 (good-faith exception applies where affidavit "presents a modicum of evidence, however slight, showing some connection, regardless of how remote it may have been between

the criminal activity at issue and location of the search" (cleaned up));

*United States v. Dauphinais*, No. 22-2141, 2024 WL 751653, at *6–*8

(6th Cir. Feb. 23, 2024) (same).

Contrary to the district court's ruling, the affidavit here falls

within "the very heartland of the *Leon* exception." *Christian*, 925 F.3d

at 312. Indeed, just as the en banc Court noted in *Sanders*, "[t]he

affidavit here is far more informative from the triumvirate of

paradigmatic bare bones affidavits cited in *Leon*." 106 F.4th at 469; *see*

*also Dauphinais*, 2024 WL 751653, at *8 (distinguishing "bare bones"

affidavits in other cases). Indeed, Agent Weston's 30-page, 74-

paragraph affidavit included details of several witness interviews,

Tanzil's own statements, online and documentary investigation, review

of surveillance video and tether location information, and residence

searches, which would all lead a reasonable agent to conclude that

Tanzil's iPhone would contain evidence of the target offenses.

In declining to find good faith, the court merely parroted its prior,

incorrect finding that the affidavit provided no nexus between Tanzil's

iPhone and evidence of crimes. (R.47: Order, 368–69 (reasoning that

because "there was no such nexus" that a "reasonable law enforcement

48

officer would have recognized this deficiency"). This was wrong because it blurred the distinction between the probable-cause and good-faith standards, relying on its view of the former inquiry as conclusively resolving the latter. *See United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) ("There must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function."). Instead, "reasonable inferences that are not sufficient to sustain probable cause in the first place may suffice to save the ensuing search as objectively reasonable." *McCoy*, 905 F.3d at 420. Even if the affidavit's detailed allegations somehow failed to establish probable cause, they were sufficient to satisfy the lower threshold of a "minimally sufficient nexus" for the good-faith exception.

This Court has repeatedly applied the good-faith exception to cell phone searches, even where—unlike here—"the challenged affidavit does not specifically allege a direct factual connection" between the phone and criminal activity. *Rolling*, 2024 WL 4512532, at *4. In *Rolling*, this Court recently applied the exception where the affidavit

49

established only that "Rolling's car and Rolling himself had been connected to several robberies committed with another person" and the "phone had been found in the car." *Id.* ("Even if the judge's inference that the phone itself was used in planning or discussing the robberies and would thus contain evidence of [a] crime was too tenuous to support a finding of probable cause, it was not too great a leap for good faith reliance."). Likewise, in *Merriweather*, this Court applied the good-faith exception when the affidavit explained that a confidential informant arranged a drug sale from the defendant by calling *his associate's* cell phone. 728 F. App'x at 505. The Court reasoned that "[w]hile that does not directly implicate Merriweather's cell phone, an officer could reasonably infer" that the associate then "arranged with Merriweather via cell phone where the latter was to meet the CI" and "more generally that members of [the associate's] distribution network (and Merriweather is one such member) routinely use cell phones to facilitate their illicit business." *Id.* As already explained, here, by contrast, the affidavit included case-specific facts directly tying Tanzil's iPhone to criminal activity, including a witness's and Tanzil's own statements admitting as much. So contrary to the district court's

50

conclusion, the affidavit here was even stronger than those this Court upheld in *Rolling* and *Merriweather*. (R.47: Order, 368 (citing both cases)).

To affirm the district court's order would wrongly "equate the [30]-page, extensively sourced affidavit here with the short, conclusory, and self-serving ones for which the bare-bones designation ought to be reserved." *Christian*, 925 F.3d at 313; *see also Dauphinais*, 2024 WL 751653, at *8 (distinguishing "bare bones" warrant consisting of a "single paragraph"). Agent Weston's affidavit did far more than state conclusions without providing the basis for them.

And agreeing with the district court would require agents to second-guess a finding by a federal magistrate judge that a 74-paragraph affidavit including allegations directly tying the phone to criminal activity, as well as witness interviews, home searches, reviews of surveillance video and tether location information, and documentary and online investigation, supported probable cause. Here, particularly given legal "uncertainty" in the "phone-search context," that would be asking too much of non-lawyer agents and police officers. *Rolling*, 2014 WL 4512532, at *4; *see also Sanders*, 106 F.4th at 470 ("[W]e do not ask

nonlawyer officers to discern the fine legal distinctions between one case and the next, let alone take heed from those distinctions that the affidavit here was out of bounds[.]").

At the very least, the agents had a good-faith belief that the detailed federal warrant was based on probable cause, and the district court erred when it found otherwise.

## Conclusion

The district court's order suppressing evidence obtained from the federal search warrant should be reversed.

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney

/s/ Meghan S. Bean
Meghan Sweeney Bean
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-0214
meghan.bean@usdoj.gov

Dated: May 28, 2025

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 10,081 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Meghan S. Bean
Assistant United States Attorney

Dated: May 28, 2025

53

## Certificate of Service

I certify that on May 28, 2025, I caused this Brief for the United States to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorneys of record:

Matthew Monahan, matthew_monahan@fd.org
Michael E. Carter, michael_carter@fd.org


/s/ Meghan S. Bean
Assistant United States Attorney

54

# Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 23-cr-20654:

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 14 | Indictment | 42–44 |
| 22 | Motion to Suppress | 61–71 |
| 23 | Motion to Suppress | 72–100 |
| 28 | Gov. Response to Motion to Suppress | 161–80 |
| 34 | Opinion & Order | 200–04 |
| 36 | Motion to Suppress | 207–12 |
| 36-2 | Federal Search Warrant | 215–46 |
| 40 | Gov. Response to Motion to Suppress | 264–85 |
| 40-1 | Federal Search Warrant Attachments | 286–89 |
| 41 | Gov. Response to Motion to Suppress | 290–310 |
| 45 | Reply to Gov. Response to Motion to Suppress | 349–54 |
| 47 | Opinion & Order | 361–69 |
| 50 | Notice of Appeal | 377 |
| 50-1 | Certification | 378 |
| 53 | 11/18/2024 Motion Hearing Tr. | 381–406 |