UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

**No. 25-1102**

_____

**UNITED STATES OF AMERICA**,

Plaintiff-Appellant.

v.

**JAMEEL TANZIL**,

Defendant-Appellee.

_____

INTERLOCUTORY APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
No. 23-cr-20654

_____

**Appellee's BRIEF**

_____

Michael Carter
Matthew A. Monahan
FEDERAL COMMUNITY DEFENDER
Counsel for Jameel Tanzil
613 Abbott St., Suite 500
Detroit, Michigan 48226

# **Table of Contents**

Table of Authorities................................................................2

Statement in Support of Oral Argument.................................4

Issue Presented ......................................................................5

Statement of the Case ............................................................6

Summary of the Argument ...................................................16

Argument..............................................................................17

    I.   Valid warrants particularize a nexus between the place searched and the suspected criminal behavior. The warrants used to search Jameel Tanzil's cellphone lacked a connection between the entire phone and evidence of the alleged possessory firearm offenses. ........17

       A.   The nexus requirement prohibits limitless searches. ..............18

       B.   If *Riley* has any meaning at all, a warrant to search a cellphone must have a particularized, not generalized, nexus........................20

       C.   The magistrate judge must have a substantial basis for finding a nexus...................................................................................21

       D.   The state warrant lacked specifics and generalizations about phones, crime, and people don't cut it. ............................................23

       E.   The federal warrant doesn't have the facts to tie the phone to the alleged crimes. .................................................................................25

       F.   The fraud allegations don't get the government into the phone. 28

       G.   The government's arguments and cases don't point to reversal. 29

       H.   Good faith doesn't save the warrants. .....................................33

Conclusion ...........................................................................37

Certificate of Compliance.....................................................38

Certificate of Service ...........................................................39

Designation of Relevant Documents.....................................40

# <u>Table of Authorities</u>

Cases

*Aguilar v. State of Tex.*,
  378 U.S. 108 (1964)................................................................39
*Burns v. United States*,
  235 A.3d 758 (D.C. 2020).........................................24, 25, 27
*California v. Acevedo*,
  500 U.S. 565 (1991)................................................................20
*Florida v. Jardines*,
  569 U.S. 1 (2013)....................................................................23
*Illinois v Gates*,
  462 U.S. 213 (1983)................................................................21
*Nathanson v. United States*,
  290 U.S. 41 (1933)..................................................................39
*Riley v. California*,
  573 U.S. 373 (2014).......................................................passim
*Silverman v. United States*,
  365 U.S. 505 (1961)................................................................23
*State v Baldwin*,
  664 S.W.3d 122 (Tex. Crim. App., 2022) .............................27
*United States v. Allen*,
  211 F.3d 970 (6th Cir. 2000)..................................................25
*United States v. Arnold*,
  486 F.3d 177 (6th Cir. 2007)..................................................30
*United States v. Bass*,
  785 F.3d 1043 (6th Cir. 2015)........................................passim
*United States v. Brown*,
  828 F.3d 375 (6th Cir. 2016)...........................................22, 40
*United States v. Griffith*,
  867 F.3d 1265 (D.C. Cir. 2017) .............................................39
*United States v. Leon*,
  468 U.S. 897 (1984)................................................................37
*United States v. Lunato*,
  763 F. App'x 483 ...................................................................30
*United States v. McPhearson*,
  469 F.3d 518 (6th Cir. 2006)..................................................22

*United States v. Merriweather*,
  728 F. App'x 498 (6th Cir. 2018)................................................. passim
*United States v. Reed*,
  993 F.3d 441 (6th Cir. 2021).............................................................37
*United States v. Rolling*,
  2024 WL 4512532 (6th Cir. Oct. 17, 2024) .............................23, 28, 39
*United States v. Sanders*,
  106 F.4th 455 (6th Cir. 2024) ......................................................22, 26
*United States v. Sheckles*,
  996 F.3d 330 (6th Cir. 2021).................................................... passim
*United States v. West*,
  520 F.3d 604 (6th Cir. 2008).............................................................21
*United States v. White*,
  874 F.3d 490 (6th Cir. 2017)........................................................37, 38
*United States v Carpenter*,
  360 F.3d 591 (6th Cir. 2004)..................................................22, 34, 37
*Vernonia School Dist. 47J v. Acton*,
  515 U.S. 646 (1995).........................................................................20
*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978).........................................................................39

Statutes

U.S. Const. amend. IV....................................................................20, 21

## <u>Statement in Support of Oral Argument</u>

Jameel Tanzil requests argument. Like most Fourth Amendment cases, this one is fact intensive, as there are two warrants from two distinct sovereigns covering two different investigations. Oral argument will help this Court address and answer any fact-specific questions. Also like most Fourth Amendment cases, this one involves two nested legal issues and oral argument will assist the court in wading through them.

## <u>Issues Presented</u>

I.    Can a warrant to search the entire contents of an iPhone satisfy the nexus requirement by relying largely on generic information about the ubiquity of cellphones in American life?

II.    Can officers claim good-faith reliance on a warrant lacking even a minimally sufficient nexus between a dragnet search of a cellphone and alleged possessory firearms offenses?

# **Statement of the Case**

It's Fall 2023. Jameel Tanzil finds himself the target of two parallel investigations, both stemming from the shooting death of a teenager in Pontiac, Michigan. (Federal Affidavit, R.36-2, PageID # 216; State Affidavit, R. 23-2, PageID # 94.) Deputies of the county sheriff investigating the homicide sought a warrant to search Tanzil's phone for evidence of felon-in-possession of a firearm. (State Affidavit, R. 23-2, PageID # 100.) Two months later, an ATF agent sought a warrant to search Tanzil's phone for evidence of possessory firearms offenses as well as fraud and identity theft charges. (Federal Affidavit, R.36-2, PageID # 220-245.)

The affidavit accompanying the state warrant identified Tanzil as "a known associate of the suspect of the homicide." (State Affidavit, R. 23-2, PageID # 94.) In addition, officers located Tanzil's phone near him at the time of his arrest. (State Affidavit, R. 23-2, PageID # 94-95.) While in custody, Tanzil admitted to having "handled" three guns recovered from a home near the shooting.  (State Affidavit, R. 23-2, PageID # 95.)

Tanzil insisted he didn't possess any of the recovered weapons at the time of the shooting. (State Affidavit, R. 23-2, PageID # 95.) Instead,

Tanzil handled the guns "while filming a music video" a few weeks before the shooting. (*Id*.) The homicide suspect, not Tanzil, brought the guns to the music video. (*Id*.) And Tanzil said his phone would clear him of the homicide. (*Id*.) Ultimately, Tanzil denied consent to search his phone. (State Affidavit, R. 23-2, PageID # 96.)

After mentioning Tanzil's prior felony conviction, the remainder of the state affidavit offered generalities. (State Affidavit, R. 23-2, PageID # 96.) People "involved in illegal firearms trade" often conduct business on social media sites like Twitter and Facebook. (State Affidavit, R. 23-2, PageID # 98.) People who unlawfully purchase firearms keep records, sometimes in "electronic form," stored on "cellular devices." (State Affidavit, R. 23-2, PageID # 98.) People who unlawfully purchase or possess firearms take and store pictures of firearms with cellular devices, both old and new. (State Affidavit, R. 23-2, PageID # 98-99.)

The affidavit justified the above generalities with a nod to training and experience. Based on both, the officer believed "that the execution of this search warrant may contain evidence of criminal conduct and this evidence is essential for evidence related to Felon in Possession of a Firearm." (State Affidavit, R. 23-2, PageID # 100.)

7

The state sought access to every corner of Tanzil's phone. Officers wanted "all incoming and outgoing cellular calls" plus "all incoming and outgoing Short Service Messages (SMS) and/or Multimedia Messaging Service (MMS) text messages, instant messenger messages, email messages, and digital attachments." (State Warrant, R. 23-2, PageID # 93.) They wanted metadata and "the actual" content of the messages. (State Warrant, R. 23-2, PageID # 93.) They sought "all available location data," "all videos and pictures," "all incoming and outgoing correspondence," and "alternate or previously used contact information (including name, address, telephone number, and email address." (State Warrant, R. 23-2, PageID # 93.) The affidavit didn't provide a timeframe to limit the state's rummaging.

A state magistrate judge signed the warrant. (State Affidavit, R. 23-2, PageID # 100.) The warrant granted access to everything the affidavit asked for. (*Id.*) Like the affidavit, the warrant didn't provide a timeframe to limit the scope. (*Id.*)

Roughly two months later, an ATF agent sought a warrant in the Eastern District of Michigan. (Federal Warrant, R. 36-2, PageID # 215.) The affidavit identified Tanzil as the target of three separate

investigations: (1) the October homicide; (2) a shooting a month earlier; and (3) insurance fraud. (Federal Warrant, R. 36-2, PageID # 219-220.) In search of evidence of all the above, the ATF wanted nearly everything on Tanzil's phone, plus the state's digital extraction of the phone. (Federal Warrant, R. 36-2, PageID # 220.)

The ATF agent's affidavit included more detail about the October homicide. Police searched a home near the shooting, Tanzil's child was in the home, as were three guns hidden under some stairs, two of which were used in the shooting, one of which was a PX9 pistol. (Federal Warrant, R. 36-2, PageID # 222-223.) A witness claimed to see Tanzil firing a PX9 pistol at the victim. (Federal Warrant, R. 36-2, PageID # 223.)  The ATF agent included Tanzil's admission to handling the guns during the music video and Tanzil's belief that his phone would clear him. (Federal Warrant, R. 36-2, PageID # 223.)

The ATF agent's affidavit went on to describe other alleged bad acts. In August 2023, Tanzil attempted to purchase someone else's firearms (Federal Warrant, R. 36-2, PageID # 224-225.) Tanzil met with the potential seller, photographed the firearms, and used Snapchat to send images to someone else. (Federal Warrant, R. 36-2, PageID # 217.)

9

Tanzil didn't end up buying the guns. (Federal Warrant, R. 36-2, PageID # 225.) The next day the guns' owner noticed the guns were missing. (Federal Warrant, R. 36-2, PageID # 225.)

The federal affidavit memorialized Tanzil's alleged involvement in another shooting. In September 2023, police officers responded to 911 calls about shots fired at a hookah lounge. (Federal Warrant, R. 36-2, PageID # 225.) Surveillance video captured two men fighting, and one of them, a man in a track suit, drew a pistol. (Federal Warrant, R. 36-2, PageID # 226.) When the other person fired, the man in the track suit fired back. (Federal Warrant, R. 36-2, PageID # 226.) Review of Tanzil's tether records confirmed his presence at the hookah lounge at the time of the shooting. (Federal Warrant, R. 36-2, PageID # 227.)

The affidavit summarized the results of a probation compliance check. On October 31, 2023, officers searched a residence Tanzil registered with his probation officer. (Federal Warrant, R. 36-2, PageID # 227.) Officers found a .22 caliber rifle inside a cabinet in Tanzil's bedroom. (Federal Warrant, R. 36-2, PageID # 228.)

The affidavit outlined a sketch of Tanzil's alleged role in a scam. Across multiple states, someone filed fake unemployment insurance

claims using Tanzil's name, contact info, and social security number. (Federal Warrant, R. 36-2, PageID # 235-236.) Many of the claims, filed over the course of a year, traced to the same IP address tied to a Detroit location. (Federal Warrant, R. 36-2, PageID # 236-237.)

The federal affidavit detailed Tanzil's criminal history, offered a chain of custody for the target cellphone, and provided background on insurance fraud. (Federal Warrant, R. 36-2, PageID # 229-234.) It also contained general information. Similar to the state affidavit, the ATF agent said people tend to use social media to communicate and memorialize the details of illegal gun purchases. (Federal Warrant, R. 36-2, PageID # 239-241.) As proof, the agent cited Tanzil's Snapchat photo of a gun. (Federal Warrant, R. 36-2, PageID # 239.)

The ATF agent included general observations about cellphones. "Based on my training and experience, individuals keep their cellular phones with or near their person at all times." (Federal Warrant, R. 36-2, PageID # 240.) "Rarely do people leave their homes without their cellular phones." (Federal Warrant, R. 36-2, PageID # 240.)

The ATF agent believed probable cause existed to search the phone for "evidence regarding the illegal possession and acquisition of

11

firearms." (Federal Warrant, R. 36-2, PageID # 242.) In support, the agent cited: (1) Tanzil's prohibited status, (2) social media activity involving "his violations," as well as (3) Tanzil's statements about handling weapons and telling the officers his phone contained exculpatory evidence. (Federal Warrant, R. 36-2, PageID # 242.)

An attachment to the warrant listed the target offenses: fraud, theft, and possessory firearms charges. (Attachment B, R. 40-1, PageID # 287.) It also listed the contents the agent wished to search. (*Id*.) The agent sought access to all "incoming and outgoing calls" from August to November 2023, all "Internet browsing, including favorites and history, pertaining to the target offenses," and all text messages and emails "pertaining to the target offenses . . . contained in messaging applications (such as Facebook Messenger) installed on the phone." (Attachment B, R. 40-1, PageID # 287.)

The agent wanted all "past location" data." (Attachment B, R. 40-1, PageID # 289.) The agent wanted social media posts, messages, images, and videos. (Attachment B, R. 40-1, PageID # 288.) The agent sought "any information related to the identification of other coconspirators. (*Id*.) And

12

the agent wanted to search financial transactions, "bank records, checks, credit card bills, account information, and other financial records." (*Id.*)

The agent defined "records" and "information" broadly. Those terms included "all of the foregoing items of evidence in whatever form and by whatever means they may been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form." (Attachment B, R. 40-1, PageID # 289.)

A magistrate judge signed the warrant. (Federal Warrant, R. 36-2, PageID # 246.) The ATF agent found evidence linking Tanzil to the September shooting, leading to a single count indictment alleging felon in possession of ammunition. (Indictment, R. 14, PageID # 42.)

Tanzil filed two motions to suppress, one for each warrant. (State Warrant, R. 23; Federal Warrant, R. 36.) Tanzil urged suppression because neither affidavit established a nexus between the entirety of Tanzil's iPhone and evidence of the criminal possession of firearms or ammunition. (Motion, R. 23, PageID # 77-82; Motion, R. 36, PageID # 212; Transcript, R. 53, PageID # 389.) Tanzil also challenged the

warrants on overbreadth grounds. (Motion, R. 23, PageID # 82-86; Motion, R. 36, PageID # 212.)

Tanzil acknowledged the federal warrant "was the stronger of the two." (Transcript, R. 53, PageID # 385.) It provided "probable cause to believe that [Tanzil] committed crimes." (Transcript, R. 53, PageID # 388-389.) And it "establish[ed] [a] connection" between Tanzil and firearms. (Motion, R. 36, PageID # 211.) But both affidavits did "a poor job in connecting anything to the actual cellphone." (Transcript, R. 53, PageID # 389.) Tanzil thus summarized the affidavit's approach: "just because somebody commits a crime and they have a cellphone, that that gives us the right to go through the cellphone." (Transcript, R. 53, PageID # 389, 394.)

The government disagreed. In opposing the motions, the government saw no Fourth Amendment violation and reason to apply the good-faith exception. (Government's Response, R. 40, PageID # 270-280.) To get to nexus, the government initially leaned on the officers' training and experience dealing with cellphones. (Transcript, R. 53, PageID # 390.) But the district court pushed back: "you can make that argument with boilerplate language on every single affidavit for anyone who has

14

committed a crime. I mean, cellphones are ubiquitous. Everyone has one. No one puts it aside when they are going to commit a crime. Let's stick to things other than training and experience." (Transcript, R. 53, PageID # 391.)

The district court found the warrants deficient, declined to apply good faith, and suppressed the evidence from the phone. The court rightly said no direct evidence in the affidavits established that Tanzil used the phone during the alleged offense or that the phone stored evidence of the offense. (Order, R. 47, PageID # 367.) From there, the district court explained why the affidavit, taken as a whole, didn't provide a nexus. The photograph Tanzil took of someone else's weapon didn't help because the affidavit didn't specify what type of device Tanzil used. (Order, R. 47, PageID # 367.) Tanzil's claim that the phone contained exculpatory evidence didn't go toward proof of "contraband or evidence of a crime." (Order, R. 47, PageID # 368.) The affidavits said nothing about GPS location data placing the phone near the shooting. (Order, R. 47, PageID # 367.) And the affiant's training and experience was useful, but not enough to search everything on the phone. (Order, R. 47, PageID # 367.)

The government appealed.

15

# Summary of the Argument

Consider a hypothetical warrant affidavit typed out in the pre-cellphone era. The affidavit sets out numerous, specific reasons to suspect a person of criminal activity. Indeed, the affidavit does a stellar job painting the target as worthy of police investigation. The police seek permission to search every nook and cranny of the person's home. But to justify such an intrusive search, the affidavit offers few specifics connecting the crimes to the home. Instead, the officers say, based on training and experience, that the target is a person, persons tend to live in homes, and homes tend to have evidence of crimes in them.

Handed the above affidavit, a magistrate judge shouldn't issue a warrant. The Fourth Amendment requires a particularized connection between the place searched and the crime alleged. And an affidavit relying mostly on generalized information doesn't have the facts necessary to connect a specific place to a suspected crime.

The two affidavits used to search Jameel Tanzil's cellphone suffer the same problem: light on specifics, heavy on generalizations. The warrants thus fail the nexus requirement. Good faith doesn't apply, and the district court was right to grant suppression.

16

## <u>Argument</u>

I. **Valid warrants particularize a nexus between the place searched and the suspected criminal behavior. The warrants used to search Jameel Tanzil's cellphone lacked a connection between the entire phone and evidence of the alleged possessory firearm offenses.**

This case presents a constitutional issue—whether two search warrants satisfy the Fourth Amendment's nexus requirement. As with any constitutional question, first principles require a grounding in the text. The Fourth Amendment provides a "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.

At its core, the Fourth Amendment safeguards against unreasonable government intrusions into private spaces. *Riley v. California*, 573 U.S. 373, 381–82 (2014). Most of the time, reasonableness boils down to a simple command: "get a warrant." *Riley*, 573 U.S. at 403; *see also id.* at 382 (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)); *California v. Acevedo*, 500 U.S. 565, 582 (1991) (Scalia, J., concurring in judgment) (it is "textually possible" that the need for a warrant is "implicit within the requirement of reasonableness")

17

**A. The nexus requirement prohibits limitless searches.**

But not just any warrant. The Fourth Amendment says "no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched . . . ." U.S. Const. amend. IV. The text's emphasis on particularity prevents general warrants, essentially limitless invitations for police to "rummage through homes in an unrestrained search for evidence of criminal activity." *Riley*, 573 U.S. at 403.

A particularized warrant demonstrates a nexus between the place searched and the crime alleged. *Illinois v Gates*, 462 U.S. 213, 238 (1983) (the affidavit must give rise to "a fair probability that contraband or evidence of a crime will be found in a particular place"). To establish a valid nexus, it isn't enough for an affidavit to offer "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, . . ." *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008).

There are no bright-line rules in this space. *United States v. Sanders*, 106 F.4th 455, 466 (6th Cir. 2024). That said, generalizations about the usual behavior of a criminal, absent more, isn't enough to establish a nexus. *Sanders*, 106 F.4th at 466. And the "more" required must be

18

particularized to the location searched. *United States v. Brown*, 828 F.3d 375, 383–84 (6th Cir. 2016) ("[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, . . . it cannot be inferred that drugs will be found in the defendant's home— even if the defendant is a known drug dealer"); *United States v Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (offering a useful example of an insufficient nexus where the affidavit said only that marijuana was growing "near" a home); *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (valid warrant requires "particularized facts" showing that "evidence of a crime will be located on the premises of the proposed search").

Traditionally, nexus issues popped up in cases involving searches of homes. *See, e.g., Sanders*, 106 F.4th at 462 (collecting cases). But more and more now, nexus issues arise in cases involving cellphones. *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021); *United States v. Merriweather*, 728 F. App'x 498, 505 (6th Cir. 2018); *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015); *United States v. Rolling*, No. 23-1045, 2024 WL 4512532, at *3 (6th Cir. Oct. 17, 2024). This is one such case.

19

**B.** **If *Riley* has any meaning at all, a warrant to search a cellphone must have a particularized, not generalized, nexus.**

Homes are constitutionally sacred spaces. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *Silverman v. United States*, 365 U.S. 505, 511 (1961) ("at the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion"). And after *Riley*, so are cellphones. *Riley*, 573 U.S. at 396–97, 403.

Cellphones contain more personal data than most homes. *Riley*, 573 U.S. at 397. An iPhone captures a detailed "montage" of its owner's life. *Id.* at 396–97. Unlike any home, cellphones record a running log of a person's physical location, document religious practices, memorialize romantic encounters, and store information related to physical and financial health. *Id.* at 394–97. Unlike most homes, cellphones have the capacity to store "millions of pages of text, thousands of pictures, or hundreds of videos." *Id.* at 393–94. Cloud computing aside, cellphone storage capacity has only increased since *Riley*. *Id.* at 394 ("current top-selling smart phone has a standard capacity of 16 gigabytes").

20

As the search of a home requires a warrant, so too does a search of a cellphone. *Id.* at 403. But not just any warrant. In the years since *Riley*, courts across the country have homed in on the nexus requirement when reviewing cellphone warrants. *See Burns v. United States*, 235 A.3d 758, 775–76 (D.C. 2020) (collecting cases).

In jurisdiction after jurisdiction, including this one, courts have made clear that a valid nexus ties the person to the phone and the phone to the crime alleged. *Bass*, 785 F.3d at 1046–47 (nexus to search phone's contents where police knew the phone was instrumental to the fraud, tied the target to the phone, and the target was using the phone at the time of arrest); *Sheckles*, 996 F.3d at 338–39 (nexus established for location data where affidavit tied phone to drug distribution scheme and tied phone to person via informant and "toll analysis"); *Burns*, 235 A.3d at 775–77 (nexus established for location data but not for the contents of text messages).

## C. The magistrate judge must have a substantial basis for finding a nexus.

The affidavits in this case lacked a nexus for two reasons. First, generalizations about the ways people use phones, coupled with the ways phones help criminal investigations, are insufficient to establish a nexus

between Tanzil's phone and possessory firearms offenses. Second, the affidavits don't provide the magistrate judge with enough factual information tying the phone to the crime.

When a nexus issue hits an appellate court, the district court's legal work gets *de novo* review, giving no deference to the district court's "after-the-fact conclusion" that the affidavit lacked a sufficient nexus. *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021). The magistrate judge's first-in-time decision to issue the warrant receives "great deference," and the sole concern is whether the magistrate judge had a "substantial basis" for finding a nexus. *Sheckles*, 996 F.3d at 337 (cleaned up); *see also United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000). At this stage, this Court cabins its review to the "sworn information" provided to the magistrate judge—here, the affidavits. *Sheckles*, 996 F.3d at 338.

Reviewing a magistrate judge's determination comes with some ground rules. It's a totality-of-the-circumstances approach. *Sheckles*, 996 F.3d at 338. And the analysis turns on common-sense inferences made available by the facts provided. *Id.*; *see also Sanders*, 106 F.4th at 463.

22

**D. The state warrant lacked specifics and generalizations about phones, crime, and people don't cut it.**

Begin with the state warrant, obtained during an investigation into an October 2023 homicide. The officer sought evidence that Tanzil, a prohibited person, possessed a firearm. (State Warrant, R. 23-2, PageID # 100.)

As to the phone, the affidavit is light on specifics. The phone was near Tanzil when he was arrested, and he said the phone could clear him of the homicide. But that's it. Anything else phone related was just generalizations—about how common phones are in American life and how they often contain evidence of crimes. The affidavit doesn't link Tanzil's phone to the prohibited possession of a firearm. Say, for instance, evidence of digital communication between Tanzil and the homicide suspect. *Cf. Bass*, 785 F.3d at 1046–47. Or the phone's location on the day of the shooting. *Cf. Sheckles*, 996 F.3rd at 340–41.

The district judge was right to conclude that generalizations about phones and phone usage are helpful, but not enough to get a nexus. (Order, R. 47, PageID # 367.) Other jurisdictions agree. *See State v Baldwin*, 664 S.W.3d 122, 134 (Tex. Crim. App., 2022), cert den 143 S Ct 777; 215 L Ed 2d 47 (2023) (no nexus where affidavit contained only

generalizations about phones and phone use); *Burns*, 235 A.3d 758, 773–74 (affidavit had enough nexus to permit a search of location data, but nothing specific in the affidavit established a nexus between phone's contents and criminal activity); *see also People v. Carson*, --N.W.2d--, --  (Mich. Ct. App. 2024); 2024 WL 647964, at p. *14 (Hood, J., concurring) (warrant to search phone, based on boilerplate generalizations, failed both nexus and particularity requirements).

It's true, generally, that most people have a phone and many people use their phone all the time. But if those generalizations get to a nexus when a person is suspected of a crime, then functionally there's no warrant requirement. *Rolling*, 2024 WL 4512532, at *3. Tanzil made a similar point at the motion hearing. (Transcript, R. 53, PageID # 389, 391.)

The district court likewise got it right in finding no nexus based on Tanzil's statement about exculpatory evidence on the device. (Order, R. 47, PageID # 368.) Pushing back, the government says the district court required the police to rule out innocent explanations, something officers don't have to do. (Appellant's Brief, Doc. 13, p. 48-49.) And the government thinks the district court made the wrong inference: Tanzil's

24

insistence on his innocence made it *likely* the police would find incriminating evidence on the phone. (Appellant's Brief, Doc. 13, p. 48-49.)

But what's the reasonable inference from a person's statement that their phone will clear them? Not, as the government thinks, that the phone was present at the scene of the crime and contains evidence of the conspiracy to commit it. (Appellant's Brief, Doc. 13, p. 44.) It stretches common sense to turn a statement about exculpatory evidence into suspicion of criminal activity.

That's not to say, as the government does, that the police must credit the statement and pack it in. (Appellant's Brief, Doc. 13, p. 41-42.) Rather, it means the police need to investigate further to tie the phone to the crime. On the four corners of the state affidavit, there's no valid nexus between a possessory firearms offense and everything on the phone.

### E. The federal warrant doesn't have the facts to tie the phone to the alleged crimes.

The federal warrant fares only slightly better. Recall that the ATF agent's view of probable cause leaned on (1) Tanzil's prior criminal history; (2) the photo of the gun; and (3) Tanzil's statements to police.

To be sure, the federal warrant does a better job depicting Tanzil as a person involved in criminal activity. Considering the prior criminal history, attempts to purchase weapons, two shootings, and a fraud scheme, Tanzil looks every bit like someone police should investigate. But, for all the federal affidavit's specifics about Tanzil's alleged bad acts, it contains very few specifics about Tanzil's use of the phone during the bad acts.

In August 2023, Tanzil photographed a gun using Snapchat. As the government points out, it's reasonable to infer Tanzil used a phone (not a standalone camera) to send a photo via the Snapchat app. (Appellant's Brief, Doc. 13, p. 47.) And it's reasonable to infer that the Snapchat data wouldn't be tied to a specific phone. (Federal Warrant, R. 36-2, PageID # 239.)

Even so, a Snapchat photo doesn't establish a nexus between *possession* of a weapon and the entire contents of the phone. That's especially true given the common-sense inference that Snapchat data travels with the app as the owner upgrades their phone. Moreover, the district court was right to point out that "taking a picture" of a gun that Tanzil never purchased "doesn't mean that [Tanzil] possessed it. You can

26

take a picture without having physical or even constructive possession of [the gun]." (Transcript, R. 53, PageID # 387). Caselaw supports the judge's position. *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007). It'd be different if Tanzil took a photo *holding* the weapon. *United States v. Lunato*, 763 F. App'x 483, 486-87. And the government never explained how one Snapchat photo established a nexus between a possessory firearms offense and other apps, like Facebook or the email client, let alone the content of texts and calls and location data.

Consider the implications of the government's position as applied to home searches. Someone takes a picture. Homes are places people store photos. So, the police can search every room in the house, every container in the kitchen, every corner of the crawlspace looking for pictures, phone calls, letters, bank records, everything?

That's essentially the government's ask, applied to a phone. Tanzil looks like a bad man, and we know he has a phone. We know he took a photo, likely with *a* phone. So, let us pore over every inch of *this* phone, as there's probably bad stuff somewhere on it. One Snapchat photo isn't a substantial basis to find a nexus between everything on the phone and Tanzil's alleged possession of ammunition.

27

### F. The fraud allegations don't get the government into the phone.

The federal affidavit's allegations about an insurance scam don't amount to a substantial basis, either. From what's provided, it's hard to tell if Tanzil is the victim or the scammer. And even if Tanzil is the scammer, what the affidavit contains points *away* from a phone. Over the course of a year, at least some of the filings traced back to the same IP address. (Federal Warrant, R. 235-236.) Common sense says a phone connected to a mobile data network will rely on a dynamic IP address, so won't register the same one over a long period. Common sense also says that registering the same IP address over a long period suggests a home computer tied to a home WiFi. Not to mention, the fraud information is a bit stale. Whoever filed the applications did so in 2020 and 2021, years prior to the warrant.

The remainder of the fraud portion was generic. People keep fraudulent data for years, they keep it on multiple devices, and scammers usually have associates with whom they communicate. (Federal Warrant, R. 36-2, PageID # 238-239.) Here too, boilerplate is helpful, but applicable to any and all fraud crimes, so not enough to rely on, absent more,

without erasing the warrant requirement. All told, the fraud allegations don't connect the scam to Tanzil's phone.

### G. The government's arguments and cases don't point to reversal.

The government insists the district court applied too exacting of a scrutiny. (Appellant's Brief, Doc. 13, p. 45-48.) The district court read the affidavit in a "hypertechnical" way, says the government, choosing a "line-by-line" approach when something more holistic is appropriate. (Appellant's Brief, Doc. 13, p. 45.) And yet, the government also says the district court "lumped together its analysis" of two distinct affidavits. (Appellant's Brief, Doc. 13, p 29.)

A "lumped" analysis sounds like the required "totality of the circumstances" approach and doesn't square with a "hypertechnical" view. The district court read both affidavits. The district court noted where the affidavits might support a nexus. And the district court explained why the potentially supportive parts didn't get there. Moreover, in resisting the district court's conclusion, the government takes a line-by-line approach. To the government, two lines do the trick: Tanzil's statement and the fact that he took a photo of some guns.

The government faults the district court for applying the wrong law. (Appellant's Brief, Doc. 13, p. 45.) The government says the district court failed to say why the affidavit flunked the "fair probability" of criminal activity test. (*Id.*) But, as the government concedes, the district court said the warrant lacked any "allegations stating that the phone was used during the alleged offenses or that it was used to store evidence of the offenses." (*Id*; *see also* Order, R. 47, PageID # 367.) On that score, the district court is right, as the absence of enough facts means the affidavit falls short on any test.

The government thinks the district court erred by focusing on what isn't in the affidavit. (Appellant's Brief, Doc. 13, p. 51-52.) But the district court's analysis tracks what this Court has done when a suppression claim turns on the *absence* of a nexus. *See Carpenter*, 360 F.3d at 594–95 (6th Cir. 2004) (highlighting what isn't in the affidavit and explaining why what's missing would help establish one).

Nor does the government's precedent help them. Tanzil's situation looks little like *Bass*. There, a financial crimes task force started looking into an identity theft ring. *Bass*, 785 F.3d at 1046–47. Bass and his co-conspirators stole personal identifying information and used it to hijack

credit and bank accounts. *Id.* The hijacked accounts traced back to Bass's phone number. *Id.* Bass orchestrated the scheme, and when police arrested him, he was on his cellphone, possibly notifying his co-conspirators of impending arrest. *Id.* at 1047, 1049.

This court had no trouble finding a nexus between a vast conspiracy, a cellphone tied to fraudulent accounts, and the owner of the cellphone using the phone when arrested. *Id.* at 1049. Unlike *Bass*, this case doesn't involve a complicated web of interpersonal communication between multiple fraudsters. It's a single-count indictment charging a single defendant with possessing ammunition on a single day. And what evidence the affidavit does have of any fraud points away from a phone used to commit it.

This case is unlike *Sheckles*. There, police investigated an international drug-trafficking conspiracy. *Sheckles*, 996 F.3d at 335-37. The ringleaders sent drugs from Mexico to Louisville. *Id.* From a Louisville stash house, the co-conspirators distributed massive quantities of cocaine. *Id.* at 335-36. Eventually, the DEA obtained a pen register of the ringleader on the Mexican end of the business. *Id.* at 337. The pen register identified the phone number of the Louisville

distributor. *Id.* Police also learned the ringleader intended to complete a large shipment to the Louisville distributor. *Id.* at 339. Police obtained a tracking warrant to ping the location of the distributor's phone. *Id.* at 338-39.

As to the location data, this Court found the magistrate judge had a substantial basis to find a nexus. *Id.* The DEA had been investigating the operation for a decade. *Id.* at 335. The DEA knew the identity of the ringleader on the Mexican side. From the register, they obtained the number of the Louisville distributor. CI's told the DEA about an impending delivery to the Louisville distributor. The DEA sought a warrant to ping the distributor's phone—because they knew the phone had a connection to drug distribution.

The *Sheckles* location-data affidavit looks little like the top-to-bottom search done here. *Sheckles* featured an affidavit all about the phone's connection to drug trafficking. How else would international drug traffickers communicate? In this case, the affidavit is all about Tanzil's involvement in criminal activity, not the phone's connection to crime.

At bottom, the district court made the right call. The magistrate judge didn't have a substantial basis to sign off on the warrants. The deficient

warrants violated Tanzil's right to be free from a limitless rummaging through his phone.

### H. Good faith doesn't save the warrants.

*Leon* teaches that when officers rely on bad warrants, they get the benefit of the doubt—except in cases involving the most obvious of deficiencies. *United States v. Reed*, 993 F.3d 441, 452 (6th Cir. 2021). Obvious deficiencies fall into four categories. *United States v. Leon*, 468 U.S. 897, 923 (1984). One of those categories, when a warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," controls this case. *Leon*, 468 U.S. at 923.

Warrants "so lacking" in "probable cause" are properly considered "bare bones." *United States v. White*, 874 F.3d 490, 506 (6th Cir. 2017); *see also Leon*, 468 U.S. at 926. "Bare bones" warrants lack even a "minimally sufficient nexus" between the alleged crime and the place searched. *Carpenter*, 360 F.3d at 595; *see also Sanders*, 106 F.th at 468–69.

"Bare bones" paints a stark picture. So, it's understandable that the government points to the "30-page, 74-paragraph affidavit" provided to

the federal magistrate judge and says the "minimally sufficient" standard is met. (Appellant's Brief, Doc. 13, p. 55.) But look at the government's evidence in *both* affidavits. Yes, the federal affidavit has meat on the bones when it comes to Tanzil's criminal activity. (Transcript, R. 53, PageID # 385.) But neither affidavit fleshes out a nexus between possessory firearms offenses and *everything* on the phone.

Return, for a moment, to the affidavits' emphasis on officer "training and experience." It's the "training and experience," according to the officers, that connect Tanzil's suspected criminal activity to a dragnet search of the phone. Yet relying on generalizations gleaned from law enforcement employment essentially asks the magistrate judge to "'take [the officer's] word for it.'" *Merriweather*, 728 F. App'x at 506 (quoting *White*, 874 F.3d at 499). Establishing a nexus by way of "training and experience" is thus a modern version of an "archetypal example[] of [a] bare-bones affidavit[]." *Merriweather*, 728 F. App'x at 506 (citing *Aguilar v. State of Tex.*, 378 U.S. 108, 109 (1964) and *Nathanson v. United States*, 290 U.S. 41, 44 (1933)).

True, different cases describe the standard for showing a nexus in slightly different ways. *See Rolling*, 2024 WL 4512532, at *4. But subtle

34

semantic differences in the law don't save this search. The baseline rule remains clear: a warrant must state with particularity the nexus between the entire phone and the criminal activity. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *see also United States v. Griffith*, 867 F.3d 1265, 1274 (D.C. Cir. 2017) ("Because a cell phone, unlike drugs or other contraband, is not inherently illegal, there must be reason to believe that a phone may contain evidence of the crime.").

All the officers had to go on here was Tanzil's belief that the phone would exonerate him and the Snapchat photo. The statement didn't inculpate, so it's hard to see how an officer could, in good faith, think the phone had a connection to *criminal* activity. And the Snapchat photo, as just explained, wasn't evidence of actual or constructive possession. None of the above gave rise to a good-faith basis to search *the entire* phone.

This case is nothing like *Bass* or *Merriweather*. *Bass* involved a "minimally sufficient nexus" because "the affidavit stated that Bass and his co-conspirators frequently used cell phones to communicate." *Bass*, 785 F.3d at 1049. In *Merriweather*, a CI arranged controlled buys, via cellphone, with a co-defendant, and police found the target phone in Merriweather's car. *Merriweather*, 728 F. App'x at 505. Those facts led to

35

the reasonable inference that Merriweather's drug-trafficking ring relied on cellphones to arrange and finalize drug deals. *Id.* Both cases had affidavits with sufficient facts to tie the portion of the phone searched to the criminal activity.

Not so here. For all the evidence of criminal activity, the warrant affidavits don't tie the entire phone to the suspected crimes. To get the benefit of good faith, they needed to. *Brown*, 828 F.3d at 385–36 ("Although the good-faith standard is less demanding than the standard for probable cause, the affidavit still must draw some plausible connection to the [place searched].") The district judge was right to suppress.

# **Conclusion**

For the reasons stated above, Jameel Tanzil asks this Court to affirm the district court's grant of suppression.

Respectfully submitted,

/s/ Matthew A. Monahan
*with* Michael Carter
Counsel for Jameel Tanzil
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, Michigan 48226
Phone: (313) 967-5542
Email:  Matthew_Monahan@fd.org

Date: July 11, 2025

## <u>Certificate of Compliance</u>

This Brief complies with the type-volume limitation of Fed. R. App.
P. 32(a)(7)(B) because it contains fewer than 13,000 words, excluding the
parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The Brief
contains 6291 words.

<u>/s/ Matthew A. Monahan</u>

## Certificate of Service

I certify that on July 11, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to opposing counsel of record.

Respectfully submitted,

/s/ Matthew A. Monahan

## <u>Designation of Relevant Documents</u>

| Record No. | Document Description | Page ID |
|---|---|---|
| 14 | Indictment | 42-44 |
| 22 | Motion to Suppress | 61-71 |
| 23 | Motion to Suppress | 72-100 |
| 23-2 | State Search Warrant | 94-100 |
| 28 | Government Response | 161-180 |
| 36 | Motion to Suppress | 207-212 |
| 36-2 | Federal Search Warrant | 215-246 |
| 40 | Government Response | 264-285 |
| 40-1 | Federal Search Warrant Attachments | 286-289 |
| 41 | Government's Response | 290-310 |
| 47 | Opinion and Order Granting Suppression | 361-369 |
| 50 | Notice of Appeal | 377 |
| 53 | Transcript of Motion Hearing | 381-406 |